UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:12-cv-23743-PCH

RICARDO DEVENGOECHEA,

    *Plaintiff*,

vs.

BOLIVARIAN REPUBLIC OF
VENEZUELA,

    *Defendant*.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    This cause came before this Court for trial on December 4, 2023, on Plaintiff's claim under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 & 1602 *et seq.,* to recover damages caused by Defendant Venezuela's breach of contract and unjust enrichment. Defendant breached its contract with Plaintiff by failing to return to him or pay for Plaintiff's valuable collection of artifacts, documents, and memorabilia once belonging to the famous General Simon Bolivar.

    At trial, Plaintiff appeared by counsel and testified in person along with another witness, Plaintiff's former counsel Marc Ferri. Plaintiff's expert John Reznikoff testified by Zoom videoconference. Defendant did not appear at trial and violated the Court's trial-setting order [ECF No. 269], filed on July 10, 2023, by failing to (a) coordinate with Plaintiff to submit a joint pretrial stipulation and (b) submit its proposed findings of facts and conclusions of law, by their respective deadlines.[1]

---

[1] This alone would be an appropriate ground for granting a default against Defendant, Bolivarian Republic of Venezuela, and a ruling in favor of Plaintiff, Ricardo Devengoechea, on liability.

After trial on the merits and on jurisdiction under the FSIA, the Court concludes that it has jurisdiction under the FSIA and that Plaintiff has proved his case on the merits. This Court awards Plaintiff the value of his collection as set forth below plus mandatory prejudgment interest under Florida law, and taxable costs.

### Background Concerning General Simon Bolivar

It is well known that Simon Bolivar (1783-1830) was the greatest military and political leader in the history of South America. He played an immense role in the liberation and independence of five South American countries. Obviously, artifacts associated with Bolivar are desirable, unique, and valuable.

It is Plaintiff's family relationship to General Bolivar and to numerous items once belonging to Bolivar that forms the backdrop of this action.

### Findings of Fact

Plaintiff Ricardo Devengoechea, an American citizen, acquired an extensive collection of artifacts and memorabilia concerning General Simon Bolivar as a result of family inheritance.

The artifacts in this collection included thousands of historic documents including correspondence and writings of Simon Bolivar, both personal and official/governmental, many with Bolivar's signature, medals, epaulets of General Napoleon Bonaparte of France (where Simon Bolivar had resided for a time), Simon Bolivar's one-of-a-kind Liberation Medal of Peru, and a DNA sample (hair locket) (the "collection"). (Copies of this Liberation Medal of Peru and selected documents from among the thousands of documents in the collection are shown in Plaintiff's Trial Exhibit 3).

---

However, Plaintiff has stated he prefers to prove his case. So the Court allowed the matter to proceed to trial on the merits.

The collection was handed down from generation-to-generation in Plaintiff's family. Plaintiff received them from his mother who passed in 2005. Plaintiff lives in Orlando, Florida.

In October 2007 Defendant initiated telephone calls to Plaintiff in the United States concerning his collection.

Defendant initiated these communications through a mutual acquaintance, Jorge Mier Hoffman, who contacted Plaintiff on behalf of the Venezuelan government.

Pursuant to Defendant's request, Plaintiff provided to Hoffman select copies of his collection so Hoffman could send the copies to Venezuela (which the Venezuelan officials requested).

Shortly thereafter Defendant's officials contacted Plaintiff to arrange to meet him in Orlando, Florida (where Plaintiff lives) to examine and begin negotiations concerning Defendant's acquisition of the collection.

On or about October 14, 2007 Defendant's officials Ms. Delcy Rodriguez, then the Coordinator General of the Office of Vice President of Venezuela, and Mr. Alberto Arvelo and Mr. Hoffman, and other officials sent by the Venezuelan government, flew by private jet from Venezuela to Orlando, Florida to meet Plaintiff and begin negotiations. Ms. Rodriguez introduced herself, identified the office which she held in the Venezuelan government, and introduced the persons with her as officials in the Venezuelan government. Pictures showing these Venezuelan officials and Plaintiff at the Orlando airport and in the plane are Plaintiff's Trial Exhibit 2.[2]

---

[2] These pictures were taken a couple days later when Plaintiff and these Venezuelan officials departed from the Orlando airport enroute to Venezuela, discussed below.

On October 14, 2007 these Venezuelan officials and Plaintiff discussed Plaintiff's collection, his background and family history, how Plaintiff acquired the collection, and Defendant's prospective purchase of the collection.

The following day, October 15, 2007, at the request of these Venezuelan officials, Plaintiff brought his collection to their hotel in Orlando, Florida, where these officials examined the collection and where Plaintiff had an extensive meeting and negotiations with these same Venezuelan officials concerning Defendant's prospective purchase of the collection.

During this meeting, Defendant's officials requested that Plaintiff travel with them and his collection to Venezuela where Defendant's experts could examine the collection further, as well as test and catalog it, and where negotiations would continue.

Venezuelan officials requested that Plaintiff go to the Passport Office in Miami, Florida the next day to procure a new Passport on an expedited basis so Plaintiff could return to Venezuela with them and bring his collection.

These Venezuelan officials then arranged for another Venezuelan official, Ms. Zueiva Vivas, President of Venezuela's Foundation of National Museums, to email to Plaintiff a letter enlisting Plaintiff's participation in a documentary relating to Bolivar.

These Venezuelan officials gave the letter to Plaintiff and explained to him that, although the letter did not mention the collection, the letter would serve as an entre for Plaintiff to pursue possible further meetings concerning the collection (a copy of the letter in Spanish is Plaintiff's Trial Exhibit 4 and is translated in the Second Amended Complaint, [ECF No. 140 ¶ 30]).

At the request of these Venezuelan officials, Plaintiff telephoned the Passport Office in Miami, Florida, and made an appointment to procure his Passport on an emergency basis the following day.

Plaintiff agreed to do all this with the understanding and agreement by Defendant's official Ms. Delcy Rodriguez that Plaintiff would travel to Venezuela with her and the other Venezuelan officials in their private jet and would bring his collection with him, so Venezuela's officials could examine, test and catalog it in Venezuela, and that after these procedures were completed, either the parties would reach an agreement for an amount to be paid to Plaintiff for the collection or the collection would be returned to Plaintiff at his home in Orlando, Florida. In connection with this agreement, Plaintiff expected and intended that (1) any payment to him, if applicable, would be paid at his home in Orlando, Florida and that (2) the return of the collection to Plaintiff, if applicable, would be returned to him at his home in Orlando, Florida.

Plaintiff never would have flown to Venezuela with his collection without such an agreement and understanding.

On the next day, October 16, 2007, at the request of these Venezuelan officials, Plaintiff drove from Orlando to the Passport Office in Miami, Florida and obtained his Passport. Plaintiff returned to Orlando, brought his collection, and met these same Venezuelan officials at the Orlando airport for travel to Venezuela. At the Orlando airport the negotiations concerning the collection continued.

On October 17, 2007, Plaintiff boarded the private jet and had further negotiations concerning the collection in the plane, both in the United States and enroute to Venezuela (pictures of the plane, Plaintiff, and these Venezuelan officials at the Orlando airport and in the plane are Plaintiff's Trial Exhibit 2).
The negotiations concerning Defendant's acquisition of the collection continued in Venezuela, where Defendant's experts examined, tested and catalogued the collection. Plaintiff met numerous Venezuelan officials while in Venezuela who asked Plaintiff to bring his collection to the residence

of then President Hugo Chavez. Plaintiff complied and delivered his collection to a Venezuelan official at Chavez's home. Additional pictures of and by Plaintiff in Venezuela are Plaintiff's Trial Exhibit 8, Appendix C.

While in Venezuela, Plaintiff mentioned that he might have additional artifacts and memorabilia concerning Bolivar at his home in Orlando, Florida.

At the request of Defendant's officials who were examining the collection, and with the express approval of the above-mentioned Ms. Delcy Rodriguez, Plaintiff returned to Orlando, Florida, as Defendant's agent to search for and bring back to Venezuela for Defendant's benefit additional Bolivar artifacts and memorabilia, along with pictures verifying Plaintiff's residence as a child on his family farm in Colombia where his ancestors had been acquaintances of General Bolivar. Plaintiff then returned to the United States on a commercial airline by ticket paid for by Defendant. This travel to the United States occurred on October 23 through 25, 2007. (Copies of these airline tickets, paid for by Defendant, are Plaintiff's Trail Exhibit 5).

Plaintiff returned to Venezuela on October 25, 2007, and remained there for several days. Defendant's officials told Plaintiff that they needed more time to fully examine and analyze Plaintiff's collection and that they would be in touch with him concerning the purchase of the collection after their examination was completed.

Plaintiff returned to the United States, leaving his collection with Defendant with the understanding and agreement that Defendant needed more time to analyze and examine it and that upon the conclusion of this examination, Defendant would contact Plaintiff about a purchase price for the collection or would return it to him at his home in Orlando.

Plaintiff periodically contacted Defendant over the next two to three years and was told they still needed time to examine and analyze his collection because of its large size.

In July 2010 articles appeared in various newspapers that Venezuela's President Chavez had ordered the exhumation of the body of Simon Bolivar. Although not mentioned in the news articles, it became clear to Plaintiff that one reason for the exhumation was to test the DNA in the hair locket for a match. Copies of these articles are Plaintiff's Trial Exhibit 6.

Plaintiff's further inquiries of Defendant concerning his collection went unanswered after this July 2010 exhumation. Thus, it became clear to Plaintiff that Defendant had decided to retain the benefit of his collection without paying for it, thereby breaching the parties' agreement and unjustly enriching Defendant.

Plaintiff then retained counsel. Plaintiff's counsel wrote several letters to Defendant seeking the return of Plaintiff's collection or reasonable compensation for it. Copies of these letters are Plaintiff's Trial Exhibit 7. When Defendant failed to respond, Plaintiff commenced this action in 2012.

**Procedural History**

After numerous legal proceedings concerning Plaintiff's Initial Complaint and First Amended Complaint, as well as the entry of a default judgment which Plaintiff agreed to vacate upon Defendant's motion, Plaintiff filed his Second Amended Complaint on March 8, 2016 [ECF No. 140]. Defendant promptly moved to dismiss it, arguing that there was no jurisdiction under the FSIA and that Plaintiff's claim also lacked merit. Plaintiff opposed Defendant's motion. This Court denied Defendant's motion and upheld jurisdiction under the FSIA and the facial merit of Plaintiff's claim [ECF No. 165].

On an interlocutory appeal addressing the sovereign-immunity issue, the Eleventh Circuit affirmed, upholding jurisdiction under the FSIA. *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213 (11th Cir. 2018). Thereafter, Defendant filed its Answer [ECF No. 185].

The parties engaged in discovery, and Defendant in 2018 moved for a jurisdictional dismissal on the evidence and for summary judgment on the merits [ECF Nos. 221–224].

In December 2018 the parties reached a settlement. But to receive the settlement, Plaintiff needed to obtain a license from the Office of Foreign Assets Control ("OFAC license") of the U.S Treasury Department because of the U.S. sanctions program against Venezuela and numerous Venezuelan officials and industries. It took Plaintiff over two years to obtain the OFAC license, by which time developments had prevented consummation of the parties' settlement.

Meanwhile, Defendant's latest motion in 2018 for a jurisdictional dismissal and for summary judgment had been placed on hold pending the parties' unsuccessful settlement and the drawn-out OFAC license process. After the litigation resumed in 2023, Plaintiff opposed Defendant's 2018 dismissal motion [ECF Nos. 264–266]. This Court denied Defendant's 2018 motion in full [ECF No. 270] and set this case for trial [ECF No. 269].[3]

### Discussion and Conclusions of Law

Plaintiff's claim targets the "commercial activity" of Defendant under the FSIA. For this purpose, a foreign country's "commercial activity" is an activity of the type that is or could be carried on by a private business but happens to be carried on by a sovereign country. The country is not exercising authority peculiar to a sovereign (police, military, law enforcement, etc.) but is acting as if it were a private business in a commercial endeavor or commercial capacity. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612–14 (1992); *Devengeochea*, 889 F.3d at 1221–22. Defendant's actions in connection with its possible purchase of Plaintiff's collection – as if Venezuela were a collectible dealer or seller – is clearly a commercial activity for this purpose.

---

[3] Defendant's counsel also sought leave to withdraw which this Court granted earlier this year [ECF No. 253]. Since then, Defendant has been pro se which is permitted under the FSIA, and Plaintiff has been serving papers on Defendant directly.

Venezuela, when represented by counsel, conceded as much. *Devengoechea*, 889 F.3d at 1222 n.10 (quoting Venezuela's concession).

The FSIA grants courts jurisdiction over a foreign country in three circumstances involving the foreign country's commercial activities – where the claim is based upon (1) the foreign country's commercial activity within the United States, or upon (2) the foreign country's act within the United States in connection with the foreign country's commercial activities elsewhere, or upon (3) the foreign country's act outside the United States in connection with its commercial activity outside the United States that causes a direct effect within the United States. 28 U.S.C. § 1605(a)(2). This Court concludes that jurisdiction against Venezuela under the FSIA attaches under all three clauses of § 1605(a)(2).

Under the first clause, Plaintiff's claim is clearly based upon Venezuela's commercial activity within the United States. Venezuela's officials travelled to the United States where they repeatedly engaged in extensive negotiations and discussions with Plaintiff concerning his collection and Venezuela's possible purchase of it. Ultimately, still within the United States, Venezuela's officials reached the agreement with Plaintiff under which he would travel to Venezuela with them and bring his collection to Venezuela where its experts would examine and evaluate it, after which Venezuela either would pay an agreed price for the collection or return it to Plaintiff at his home in Orlando, Florida. The ultimate and dispositive contract itself was agreed to by the parties within the United States. The parties actions within the United States were not merely preliminary or introductory discussions but were extensive and multiple serious negotiations which culminated in the ultimate agreement, reached in the United States, which gave rise to Plaintiff's claim. This Court twice indicated its view that the first clause of § 1605(a)(2) provides a basis for FSIA jurisdiction here [ECF No. 270 at 6; ECF No. 165 at 10]. This Court

reaffirms its prior conclusion. Jurisdiction clearly exists under the first clause of § 1605(a)(2) based upon Venezuela's commercial activities within the United States.

Under the second clause of § 1605(a)(2), jurisdiction exists because Plaintiff's claim is also based upon Venezuela's acts within the United States in connection with its commercial activity elsewhere. The numerous acts by Venezuela within the United States, during its officials' travel to meet with Plaintiff (discussed above) clearly form a basis for Plaintiff's claim and are in connection with Venezuela's commercial activity in Venezuela. Venezuela's examination, evaluation and storage of Plaintiffs collection in Venezuela are commercial activities in Venezuela which relate to the acts within the United States upon which Plaintiff's claim is based.

Under the third clause of § 1605(a)(2), jurisdiction exists because Plaintiff's claim satisfies all three sub-elements of the third clause. That is, Plaintiff's claim is based upon Venezuela's act outside the United States in connection with its commercial activity outside the United States which had a direct effect in the United States. The Eleventh Circuit in *Devengoechea* explained precisely how Plaintiff's claim satisfied each of these three sub-elements of the third clause – (1) that the act outside the United States upon which Plaintiff's claim is based was Venezuela's decision not to return or pay for Plaintiff's collection, (2) that the commercial activity outside the United States was Venezuela's negotiation in the private market for the collection, and (3) that the direct effect in the United States was the obligation of Venezuela to return or pay for the collection in the United States upon which Venezuela defaulted. *Devengoechea*, 889 F.3d at 1224–26 (discussing three sub-elements of third clause of 28 U.S.C. § 1605(a)(2)).

The latter sub-element – the "direct effect" within the United States – exists under either of the two contractual alternatives. Under Venezuela's obligation to return the collection to Plaintiff, the direct effect in the United States existed because Venezuela was contractually

obligated to return the collection to him at his home in Orlando, Florida. Under Venezuela's alternative contractual obligation to pay an agreed price for the collection, the direct effect in the United States exists because Venezuela similarly was contractually obligated to pay Plaintiff in the United States. Indeed, under Florida law, payments are due where the creditor is located, and Plaintiff is located in Florida. *Treasure Coast Tractor Serv., Inc. v. JAC Gen. Constr., Inc.*, 8 So.3d 461, 462 (Fla. 4th DCA 2009) ("Generally, where a contract involves the payment of money and no place of payment is specified in the contract, the payment is due where the creditor resides"). By virtue of Florida law, therefore, there was a "direct effect" in the United States caused by Defendant's failure to pay.

In summary, jurisdiction is present for Plaintiff's FSIA claim under each of the three clauses in 28 U.S.C. § 1605(a)(2).

### The Expert Testimony and Damages

Under Florida law, the measure of damages is the loss proximately caused by Defendant's breach. Plaintiff's expert John Reznikoff is an experienced expert in dealing with collectibles, artifacts and antiques, such as those in the Bolivar collection. He has extensive experience and has testified in numerous cases where he has been a recognized expert. The Court finds his testimony to be well supported, thorough, and credible. In painstaking detail, he provided his conservative estimate of value as $8,810,746.30, and his fair-market valuation of Plaintiff's collection as being between 8 and 10 million dollars as of the date of the contractual breach in July 2010. The Court credits his expert testimony, and based on the testimony provided at trial, including all of the relevant factors discussed, finds that the fair-market value of the collection, and thus the principal amount of Plaintiff's recoverable loss is $9,500,000.00, at the time of the contractual breach in July 2010.

**Statutory Prejudgment Interest**

Plaintiff is entitled to recover prejudgment interest from the date of loss in July 2010 at the statutory rate which, at that time, was 6% per annum simple interest. *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, 215 (Fla. 1985) ("when a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss"); *Getelman v. Levey*, 481 So.2d 1286, 1290 (Fla. 3 DCA 1985) ("A claim becomes liquidated and susceptible of prejudgment interest when a verdict has the effect of fixing damages as of a prior date") (quoting *Argonaut Ins.*, 474 So.2d at 214 (Fla. 1985)). Once the 6% rate is fixed as of the date of loss, the 6% annual rate carries through the entire prejudgment period until entry of judgment regardless of periodic rate changes for later-accrued losses in other cases. *Regions Bank v. Maroone Chevrolet LLC*, 118 So.3d 251, 258 (Fla. 3d DCA 2013) ("the interest rate established at the time a judgment is obtained shall remain the same until the judgment is paid [citation].... The same should apply to prejudgment interest. Once the rate is obtained on the date of loss, it should remain the same"). Mandatory prejudgment interest applies to Plaintiff's contract claim, *Chiado v. Rauch*, 497 So.2d 945, 946 (Fla. 1st DCA 1986) (requiring prejudgment interest on contract claim from date of loss), and to Plaintiff's unjust enrichment claim, *Rohrback v. Dauer,* 528 So.2d 1362, 1363 (Fla. 3 DCA 1988) ("There is error, however, in the trial court's refusal to award prejudgment interest on the plaintiff's quantum meruit recovery").

The Court will enter a judgment which shall include the principal loss, $9,500,000.00, plus statutory prejudgment interest from July 17, 2010 through December 4, 2023, at the rate of 6% per annum, totaling $7,628,630.10, and will reserve jurisdiction to resolve Plaintiff's claim for costs.

Done and ordered in Miami, Florida, on December 4, 2023.

                                                        Paul C. Huck
                                                        United States District Judge